# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Dang Chang,<br><br>    Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill, Acting Commissioner of Social Security,[1]<br><br>    Defendant. | Case No. 15-cv-4496 (ADM/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

David F. Chermol, Chermol & Fishman LLC, 11450 Bustleton Avenue, Philadelphia, PA 19116 and Edward C. Olson, Attorney at Law, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401, for Plaintiff Dang Chang

Pamela Marentette, United States Attorney's Office, 300 Fourth Street South, Suite 600, Minneapolis, MN 55415, for Defendant Nancy A. Berryhill

HILDY BOWBEER, United States Magistrate Judge

   Pursuant to 42 U.S.C. § 405(g), Plaintiff Dang Chang ("Chang") seeks judicial review of a final decision by the Defendant Acting Commissioner of Social Security ("Commissioner"), who denied Chang's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The case was referred to the undersigned pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 7.2

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure Rule 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin as the Defendant in this action.

(2015).  The matter is now before the Court on the parties' cross-motions for summary judgment [Doc. Nos. 14, 16].  For the reasons set forth below, the Court recommends that the District Court grant in part and deny in part Chang's motion, and grant in part and deny in part the Commissioner's motion.

## I.    Background

### A.    Procedural History

Chang applied for DIB benefits and SSI benefits on September 30, 2011, alleging a disability onset date of September 30, 2011.  (R. 58.)  His applications were denied initially on July 18, 2012, and upon reconsideration on June 10, 2013.  (R. 58.)  Chang then requested and received a hearing.  (R. 521-39.)  An administrative law judge ("ALJ") issued an unfavorable decision on August 4, 2014, determining that Chang had not been disabled within the meaning of the Social Security Act from September 30, 2011, through the date of the decision.  (R. 55-70.)  Chang requested Appeals Council review, which denied his applications on October 23, 2015 (R. 6-10), making the ALJ's decision the final decision of the Commissioner.

### B.    Vocational Factors and Relevant Personal History

Chang was born and raised in Laos.  (R. 493.)  His mother died when he was young, and his two brothers died of an unknown illness.  (R. 493.)  In records subsequent to the relevant time period, Chang reported his mother was killed and other family members were killed in front of him when he lived in the jungle.  (R. 18.)  During his time in the jungle living with his family, he was knocked unconscious, suffering a head

2

injury, after a bomb exploded near him.  (R. 337.)  At some point, Chang escaped to

Thailand and lived in a refugee camp there.  (R. 492.)  During his escape, he was shot in

the back of his head and witnessed communists kill people, as well as dead bodies on the

road.  (R. 492.)  Chang also suffered a broken arm during his escape.  (R. 337.)  Chang

did not have any formal education in Laos.  (R. 492.)  Chang attempted to receive

education in the refugee camp, but was unable to for various reasons.  (R. 492.)

Chang moved to the United States in 2005.  (R. 492.)  He attempted taking ESL

classes for four years, but could not comprehend due to his distorted

memory/concentration.  (R. 492.)  He also volunteered two years at a community center

for Hmong elders.  This volunteer work was part of a program he was involved in for

receiving food stamps.  (R. 337.)  Chang also worked for three years at a temporary

agency and was placed in positions such as labor, assembler, and janitor.  (R. 492-93.)

### C.    Relevant Medical Records

The time period most relevant to the Court's consideration of the Commissioner's

decision is September 30, 2011, the alleged onset of disability date, through August 4,

2014, the date of the ALJ's decision.  *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir.

2000).  Medical or other evidence before or after that period of time may also be relevant

if it relates to Chang's impairments during that date range.  *See Vandenboom v. Barnhart*,

421 F.3d 745, 750 (8th Cir. 2005).

3

In seeking judicial review of the Commissioner's decision, Chang focuses on his mental impairments. He does not directly challenge the ALJ's assessment of his physical impairments. The Court tailors its summary of the medical evidence accordingly.

On March 15, 2011, approximately six months before the alleged date of disability, psychotherapist Willie Garrett provided a medical source statement. (R. 242-45.) Garrett diagnosed Chang with PTSD and gave a guarded prognosis. Garrett stated Chang's symptoms were depression, anxiety, nightmares, intrusive thoughts, irritation, and confusion. (R. 242.) Garrett opined that Chang's limitations prevented him from holding a job.

On April 8, 2011, Chang saw his primary physician, Dr. Robin Councilman. (R. 217.) Chang reported that his energy was "okay," but he was having trouble sleeping. (R. 217.) Upon review, Dr. Councilman found Chang was negative for fatigue, but positive for depression with insomnia and noted his very flat affect. (R. 215, 219.) She stated he was doing somewhat better, but he needed to see his psychiatrist. (R. 219.) Chang again saw Dr. Councilman on August 4, 2011. (R. 214.) She reported Chang was having a great deal of stress due to denial of SSI benefits. (R. 215.)

Chang again saw Dr. Councilman on December 1, 2011. (R. 214.) Chang reported feeling very depressed and tired. (R. 214.) Dr. Councilman found Chang positive for depression and insomnia, and again noted his very flat affect. (R. 214.) She wrote his depression was "worsening." (R. 215.) Chang saw Dr. Councilman again approximately ten months later on September 17, 2012. (R. 302.) Chang reported that

4

the medications he was on really helped with his stress, but that back pain interfered with sleep.  (R. 302.)  On examination, Dr. Councilman again observed a flat affect.  (R. 303.)

On May 13, 2011, Chang saw psychiatrist Dr. Colón for an initial evaluation. (R. 250.)  Dr. Colón wrote that Chang was employed until August 2009, when he suffered a fracture of his left arm and could no longer work.  (R. 250.)  After ceasing work, Chang became depressed and reported low energy and low motivation.  (R. 250.) Chang reported one suicide attempt in which he drank cleaning fluid, but found it did not taste good and he did not want to die, so he stopped taking the fluid.  (R. 250.)  During that initial visit, Chang reported low energy, low motivation, and low concentration, as well as anxiety and irritability.  (R. 250.)  Chang also reported difficulty sleeping. (R. 250.)  Upon examination, Dr. Colón found no tangentiality and no loose associations. (R. 250.)  Dr. Colón found Chang's affect to be euthymic, but his memory was intact. (R. 250.)  Chang denied any delusions or hallucinations.  (R. 250.)

Chang again saw Dr. Colón on August 12, 2011.  (R. 249.)  Chang reported he was not taking sertraline on a consistent basis and his mood was still depressed.  (R. 249.) Chang reported low energy, low motivation, and low concentration, as well as anxiety, irritability, and poor sleep.  (R. 249.)  Dr. Colón increased his sertraline dosage and added trazodone.  (R. 249.)  Chang had another appointment with Dr. Colón on November 17, 2011.  (R. 248.)  Chang reported some improvement in his energy and motivation, but his concentration was still down, with anxiety and irritability present.  (R. 248.)  His mood

had improved, but not reached a stable point.  (R. 248.)  Dr. Colón added bupropion to

Chang's medications. (R. 247.)

Chang again saw Dr. Colón on March 29, 2012.  (R. 247.)  Chang reported

improvement in energy and motivation since taking the bupropion.  (R. 247.)

Concentration was still down, however, with anxiety and irritability present.  (R. 247.)

His mood had improved, but not reached a stable point.  (R. 247.)  At his next

appointment, on June 21, 2012, Chang reported his mood was down, with low energy,

low motivation, and low concentration, as well as anxiety and irritability being present.

(R. 265.)  Dr. Colón increased his bupropion dosage.  (R. 265.)  On December 7, 2012,

Chang attended a follow-up appointment with Dr. Colón.  (R. 333.)  Chang reported a

depressed mood, low energy, low motivation, low concentration, anxiety, irritability, and

poor sleep.  (R. 333.)  Dr. Colón increased his bupropion, sertraline, and trazodone

dosages.  (R. 333.)

Chang next saw Dr. Colón on March 7, 2013, and reported improvement in his

mood, energy, motivation, and concentration.  (R. 352.)  Anxiety and irritability were still

present, but more manageable, and Chang was sleeping better.  (R. 352.)  One month

later, however, Chang reported to Dr. Colón a drop in mood since his last appointment,

with low energy, low motivation, low concentration, and increased anxiety and

irritability.  (R. 353.)  Dr. Colón accordingly changed Chang's medications.  (R. 353.)

Chang's mood had not improved by his next appointment on May 3, 2013.  (R. 354.)

Chang reported the same symptoms and Dr. Colón again adjusted Chang's medications.

(R. 354.)  At his appointment on May 30, 2013, Chang reported to Dr. Colón that his mood was more stable, with his anxiety and irritability under control.  (R. 414.)  He also reported that his sertraline caused reduced motivation and concentration in the morning, so Dr. Colón switched that medication to bedtime.  (R. 414.)  Two months later, Chang attended a follow-up appointment with Dr. Colón.  Chang reported the current combination of medications was working fairly well, and that his mood was stable, with anxiety and irritability under control, though he had somewhat low energy, motivation, and concentration.  (R. 415.)

Chang saw Dr. Colón again on October 31, 2013.  Since his last appointment, there had been a drop in mood, resulting in low motivation and concentration.  (R. 416.)  Irritability had increased, and sleep was poor.  (R. 416.)  Upon examination, Dr. Colón found Chang's mood to be depressed, his affect euthymic, but his memory intact, and he had good insight.  (R. 416.)  When Chang next saw Dr. Colón on January 2, 2014, he reported that his chief complaint was anxiety.  (R. 417.)  His sleep had improved, but his mood was still down, with low energy, low motivation, low concentration, and irritability.  (R. 417.)  Dr. Colón examined Chang and made the same findings as the previous appointment.  (R. 417.)  At an appointment three months later, on March 6, 2014, Chang reported that his mood remained depressed with the same symptoms as the previous visit.  (R. 418.)  Dr. Colón's examination resulted in the same findings as the previous two visits.  (R. 418.)

In December 2012, Dr. Colón provided a mental medical source statement. (R. 319-21.)  Dr. Colón wrote that he had treated Chang since May 13, 2011, and saw him approximately every three months.  (R. 319.)  His last appointment with Chang before completing the mental medical source statement was approximately six months prior.  (R. 319.)  Dr. Colón diagnosed Chang with major depression, recurrent, diabetes, and elevated blood pressure.  (R. 319.)  Dr. Colón also noted Chang had financial difficulties and assigned him a Global Assessment of Functioning ("GAF") rating of fifty.  (R. 319.)  Dr. Colón's prognosis for Chang was "fair."  (R. 319.)  Regarding Chang's ability to sustain work, Dr. Colón stated that Chang remained depressed, had low energy, low motivation, poor concentration, anxiety, and irritability.  (R. 319.) Dr. Colón wrote Chang's impairments were expected to last more than twelve months. (R. 319.)

Dr. Colón completed a checkbox form and found Chang was markedly limited in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for more than two hour segments, work in coordination with or proximity to others without being distracted by them, complete a normal work-day and work-week, without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors,

respond appropriately to changes in the work setting, set realistic goals or make plans independently of others, and tolerate normal levels of stress. (R. 320.) Dr. Colón found Chang was moderately limited in his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation. (R. 320.)

Dr. Colón wrote that Chang required unscheduled breaks during an eight hour workday to accommodate his difficulty concentrating, although contrary to the form's instructions, he did not indicate how many unscheduled breaks would be required. (R. 321.) Dr. Colón wrote that because of his impairments, Chang was likely to miss more than three days of work per month. (R. 321.) Dr. Colón also wrote that Chang had a medically documented history of a mental disorder that limited his ability to function outside of a hugely supportive living arrangement and that Chang was completely unable to function independently outside of his home. (R. 321.)

On July 16, 2012, James Alsdurf, Ph.D., LP, completed a mental residual functional capacity ("RFC") for the SSA. (R. 271-73.) Dr. Alsdurf found Chang was not significantly limited in any memory category, but he was moderately limited in his ability

to carry out detailed instructions, his ability to work in coordination with or proximity to others without being distracted by them, his ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to respond appropriately to changes in the work setting.  (R. 271-72.)  As a result, Dr. Alsdurf found Chang was mildly limited in activities of daily living, moderately limited in maintaining social functioning, and moderately limited in maintaining concentration, persistence, or pace.  (R. 285.)  In the narrative portion of his opinion, Dr. Alsdurf stated that Chang had the capacity to complete routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions.  (R. 273.)  Additionally, his ability to interact with coworkers and the public would be moderately impaired, but adequate for brief and superficial contact.  (R. 273.)  Finally, Chang's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive, and three and four step work setting.  (R. 273.)

On April 4, 2013, SSA psychologist Mark Schuler, Ph.D., completed a disability determination evaluation of Chang.  (R. 336.)  Dr. Schuler assigned Chang a GAF rating of forty-two.  (R. 336.)  Chang reported depressive symptoms, as well as disturbing dreams 2 to 3 days per week.  (R. 338.)  Chang attributed these dreams to his culture and beliefs, stating that they occurred because his soul did not come with him from Thailand.

(R. 338.)  Dr. Schuler found that Chang did not describe any frank hallucinations, but Chang did state that on one occasion he had heard voices that other people could not hear, specifically that one day in this world, there would be a war.  (R. 339.)  Chang also recounted dreaming that there would be a big explosion.  (R. 339.)  Dr. Schuler opined that Chang's one reported experience of hearing voices saying that there was going to be a war was a "dreamlike" experience, and noted that in the Hmong culture, there is little differentiation between the dream state and the waking state.  (R. 340.)  Dr. Schuler ultimately diagnosed Chang with major depressive disorder, recurrent, moderate to severe, without psychotic features.  (R. 340.)

Licensed social worker Panukoochi Vah completed a diagnostic assessment of Chang on November 12, 2013.  (R. 491.)  An interpreter was not present, but the report states Chang's mother[2] and spouse were present.  (R. 491.)  Vah wrote that the presenting problems were hallucinations, flashbacks, intrusive thoughts, nightmares, and other mental health symptoms.  (R. 491.)  Chang explained his nightmares were related to his escape from Laos, including communists torturing and killing Hmong, dead bodies on the road, gun shooting, and mistreatment in the refugee camp.  (R. 494.)  He reported that whenever he heard noises, he would get startled and panic.  (R. 494.)  Vah diagnosed Chang with major depression with psychotic features, PTSD, and anxiety.  (R. 495.)  She also found he had a personality disorder.  (R. 495.)  Chang saw Vah again on January 9,

---

[2] Other records before this Court indicate Chang's mother passed away when he was young.  Thus, the woman who attended with Chang's spouse may have been his mother-in-law or another woman from his community.

2014.  (R. 489.)  He reported hearing voices and sounds as if people were talking to each other.  (R. 489.)  She did not diagnose him with psychosis at that visit, however.  (R. 489.)  In subsequent visits, Vah diagnosed Chang as having depression, but did not again diagnose him with psychosis.  (R. 491, 489, 486.)

On April 28, 2015, approximately eight months after the ALJ's decision, David Tupper, Ph.D., LP, completed a neuropsychological evaluation of Chang.  (R. 17.)  Dr. Tupper wrote that there was concern as to whether Chang had a traumatic brain injury in connection with the grenade explosion from his childhood.  (R. 17.)  Dr. Tupper recounted medical records from 2015 in which Chang reported a history of past hallucinations, and in which he was diagnosed with major depressive disorder with psychotic features.  (R. 17.)  During the interview, Chang reported experiencing sightings of ghosts.  (R. 19.)

On October 3, 2015, approximately a year after the ALJ's decision, Dr. Councilman wrote a letter summarizing Chang's limitations.  (R. 15.)  Dr. Councilman wrote Chang had severe depression with psychotic features.  (R. 15.)  She wrote that Chang would not be able to hold competitive employment.  (R. 16.)

Chang submitted the additional records after the ALJ's decision to the Appeals Council, specifically medical records from Hennepin County Medical Center, dated November 24, 2014, through April 28, 2015, and the medical source statement and records from Dr. Councilman, dated April 27, 2015, through August 3, 2015.  (R. 7.)  These records included Dr. Tupper's evaluation described above.  The Appeals Council

12

did not consider this evidence because it was after the date of the ALJ's decision, August 4, 2014.  (R. 7.)  The Appeals Council wrote that if Chang wanted the SSA to consider evidence after that date, he needed to submit a new claim.  (R. 7.)

### D.     Chang's Function Report

On April 10, 2012, Chang completed a function report.  (R. 169-77.)  Chang wrote that as a result of his head injury, it was hard for him to remember things.  (R. 169.)  Additionally, as a result of his diabetes, he often felt dizzy and lightheaded.  (R. 169.)  Chang also wrote that his arm was injured and often hurt.  (R. 169.)  He recounted spending his days waking up, watching TV, and sometimes going to the park.  (R. 170.)  Chang wrote that he helped out some with his three children, but his wife did most of the childcare work.  (R. 170.)  He also reported having difficulty sleeping.  (R. 170.)

Chang wrote that his depression caused him to neglect his personal care.  (R. 170.)  He also wrote that his wife reminded him to take care of personal needs and grooming, as well as take his medicine.  (R. 171.)  Chang reported being able to prepare his own meals, specifically canned foods and noodles.  (R. 171.)  He prepared these meals once every couple of weeks, and wrote that his wife did most of the cooking.  (R. 171.)  Chang also wrote that his wife did most of the house and yard work, although sometimes he would do a little raking.  (R. 171.)

Chang reported that he went outside daily and would drive sometimes.  (R. 172.)  He indicated that he shopped for groceries, although again noted that his wife did most of the grocery shopping.  (R. 172.)  Chang wrote that he could not handle money because he

13

did not know how to handle bills or a savings account, and he had difficulty understanding money in the United States.  (R. 172-73.)  Chang reported having no hobbies or interests other than sometimes playing video games with his children. (R. 173.)  Chang wrote that he did not spend time with others, and if he could, he would spend all his time in the forest.  (R. 173.)  Chang also wrote that he could follow written instructions a little bit, but could not follow spoken instructions.  (R. 174.)  Additionally, Chang reported that his temper would flare when he became stressed and he needed to be alone during those times.  (R. 175.)

Chang had completed a first function report one week earlier, on April 4, 2012. This function report provided a little more detail about Chang's physical ailments, including his blood pressure, diabetes, arm injury, and back pain.  (R. 177.)  Chang also reported doing additional chores such as washing dishes and cleaning.  (R. 178.) Additionally, Chang wrote he enjoyed watching TV and listening to Hmong radio. (R. 181.)  Other than that, the first function report does not differ in any material aspects from the second.

### E.    The Administrative Hearing

Chang and vocational expert Stephen Bosch testified at the June 10, 2014, administrative hearing.  (R. 521.)  Chang testified with the assistance of an interpreter. He could not remember his social security number.  (R. 523.)  He did not know the specific ages of his children, and he was unable to calculate how long he had lived in the United States, but he testified that he arrived in the United States in 2005.  (R. 526.)

14

Before that, he lived in the jungle where he received no education. (R. 527.) He testified that he had attended English classes, but was not able to maintain the language because of the injury he received when he was shot in the head. (R. 527.) Chang testified that he sometimes had problems concentrating and that he was able to drive himself sometimes. (R. 528.) He testified that he hardly helped with household chores, but in his culture, some men helped with household chores, and others did not. (R. 530.) He testified that he did not enjoy seeing people and that the only thing he enjoyed doing was staying in the woods by himself. (R. 532.)

The ALJ then took testimony from vocational expert Stephen Bosch. The ALJ asked Bosch to consider a younger individual as defined by the regulations with no formal education and no work activity that met the SSA's definition of past relevant work. (R. 534-35.) That individual could perform routine, repetitive three to four step tasks and instructions. (R. 535.) These tasks would not require collaboration or teamwork with coworkers and would not involve direct interaction with the public. (R. 535.) The routine during the course of the day would need to be fixed and predictable, there would be no strict production rate, and no use of foot controls. (R. 535.) Additionally, this routine would be in the light exertional range with no climbing ladders, ropes, or scaffolds, no work at unprotected heights, only occasional climbing of ramps and stairs, occasional kneeling, crouching, crawling, frequent balancing, occasional stopping, and no exposure to extremes of heat, cold, or humidity. (R. 535.)

15

Bosch responded that such an individual could perform work as a bench assembler, molding machine tender, or cleaner.  (R. 535-36.)  Bosch further testified that such an individual could not be off task for more than 10% of the workday.  (R. 537.) Additionally, termination would be likely if the individual missed more than two days of work per month.  (R. 538.)

F.      The ALJ's Decision

In a written decision dated August 4, 2014, the ALJ determined that Chang was not disabled between September 30, 2011, and the date of the decision.  (R. 55-70.) Following the five-step sequential analysis outlined in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ first determined that Chang had not engaged in substantial gainful activity since September 30, 2011.  (R. 60.)  The ALJ concluded at the second step of the sequential analysis that Chang had the following severe impairments: hypertension, diabetes mellitus, pain characterized as facet syndrome or cervicalgia, headaches, major depressive disorder, and post-traumatic stress disorder (PTSD).  (R. 60.)

At the third step, the ALJ found that Chang did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 61.)  Specifically, the ALJ considered Listing 1.04, finding that Chang did not have the required neurological deficits associated with his back and neck impairments.  (R. 61.)  The ALJ next considered Listing 4.00, and found that all testing showed normal cardiac functioning. (R. 61.)  The ALJ noted that diabetes is not a listed impairment, but could still be

evaluated under other listings, ultimately finding that there was no evidence of systemic

complications from diabetes, so Chang's diabetes did not meet any listed impairment.

(R. 61.)  The ALJ found similarly for Chang's reported headaches.  (R. 61.)

The ALJ next considered Chang's mental impairments under Listings 12.04 and

12.06.[3]  (R. 61-63.)  The ALJ analyzed the Paragraph B criteria for Chang and

determined he had mild restriction in activities of daily living, moderate difficulties in

social functioning, moderate difficulties with regard to concentration, persistence, or

pace, and no episodes of decompensation.  (R. 61-62.)  In making this finding, the ALJ

considered the opinions of Chang's mental health professionals.  Specifically, the ALJ

gave the April 2013 opinion of Mark Schuler, Ph.D., limited weight.  (R. 62.)  The ALJ

found that Chang reported symptoms and limitations to Dr. Schuler that he did not report

to his treating psychotherapist and treating psychiatrist.  (R. 62.)  Additionally, the ALJ

found Dr. Schuler's opinion was not supported by the minimal treatment Chang received

for his psychological symptoms.  (R. 62.)  The ALJ observed Chang was not in intensive

therapy, DBT treatment, and/or day treatment.  (R. 62.)  Additionally, the ALJ pointed to

other providers' observations that Chang had the ability to attend school when he had to

in order to avoid losing county benefits, and he was able to be with his children while his

---

[3] To satisfy the criteria of Listing 12.00, mental impairments must result in at least two of
the following: "marked restriction of activities of daily living; marked difficulties in
maintaining social functioning; marked difficulties in maintaining concentration,
persistence, or pace; or repeated episodes of decompensation, each of extended duration."
20 C.F.R. § 416.920a(b)(2); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00B.

17

wife was in Thailand. (R. 62, 486, 490-92.) As a result, the ALJ gave Dr. Schuler's opinion as to disability little weight. (R. 62.)

The ALJ then considered the opinion of the state agency psychological consultant, Dr. Alsdurf, and gave that opinion great weight. (R. 63.) The ALJ found that opinion was supported by Chang's function reports, his activities reported to the consulting psychologist, minimal mental status abnormalities reported by the treating providers, observations by providers, and minimal treatment for his psychological symptoms, with no recommendations to increase the level or frequency of treatment by any treating source. (R. 63.)

Proceeding to the fourth step of the sequential evaluation, the ALJ, relying heavily on the assessment of Dr. Alsdurf, determined Chang's RFC as allowing him to perform light work as defined in 20 C.F.R. § 416.967(b), except he could not climb ropes, ladders, or scaffolds, use foot controls, work at unprotected heights, or be exposed to extreme cold, heat, or humidity; he could occasionally kneel, stoop, crouch, crawl, and climb ramps and stairs; and he could frequently balance. (R. 63.). The ALJ also determined Plaintiff could perform routine, repetitive three-to-four step tasks and instructions; the tasks must be performed independently without requiring collaboration or teamwork with coworkers; the tasks must not involve direct interaction with the public; the routine during the day must be fixed and predictable, with minimal, if any, changes from day to day; and there must be no strict production rate or pace. (R. 63.)

In explaining her assessment of Chang's RFC, the ALJ discussed Chang's reported physical impairments.  (R. 64-65.)  The ALJ next described the records of Chang's mental health treatment, and found that treatment notes from his treating psychiatrist and psychotherapist did not corroborate Chang's alleged limitations.  (R. 65.)

As to Chang's treating psychiatrist, Dr. Colón, the ALJ noted that in August 2011, one month before the alleged date of disability, Chang reported to Dr. Colón that he was not taking his medications consistently.  (R. 65.)  At that time, Dr. Colón increased Chang's sertraline dosage.  (R. 65.)  When Chang next saw Dr. Colón in November 2011, he  reported an improvement in energy and motivation which continued to his March 2012 visit.  (R. 65.)  Chang saw Dr. Colón in March 2013, April 2013, and May 2013, and the ALJ stated that Dr. Colón again reported an improvement in mood, energy, motivation, and concentration.  (R. 65.)  While irritability and anxiety were present, they were more manageable.  (R. 65.)  In July 2013, Chang reported that his medications were working fairly well, his mood was stable, his anxiety and irritability were under control, and he was sleeping well.  (R. 66.)  In October 2013, January 2014, and March 2014, Dr. Colón noted intact memory, good insight, normal psychomotor activity, and "normal rate and volume," but with depressed mood and euthymic affect.  (R. 66.)  Overall, the ALJ summarized, Dr. Colón's treatment notes were mostly normal, with depressed mood and euthymic affect, regardless of Chang's reported symptoms.  (R. 65.)  She also observed that Dr. Colón never diagnosed Chang with PTSD.  (R. 66.)

As for Dr. Colón's December 2012 evaluation of Chang's RFC, the ALJ recognized that he had found that Chang was limited in his ability to carry out most of the mental requirements of unskilled work, and he had a GAF of fifty.  (R. 67.)  The GAF Scale indicates "the clinician's judgment of the individual's overall level of functioning." *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Am. Psychiatric Ass'n Text Revision 2000).  A GAF score of fifty means that Chang had serious symptoms or a serious impairment, would be absent from work more than three days per month, and would be completely unable to function independently outside of his home.  (R. 67.)  The ALJ found, however, that Dr. Colón's opinion as to Chang's disability was based only on Chang's self-reported symptoms, and not supported by any observations, mental status examinations, or objective findings.  (R. 67.)  Additionally, the ALJ found Dr. Colón's subsequent visits with Chang showed he experienced improvement with medication. (R. 67.)  Finally, the ALJ concluded that Chang's daily and overall activities did not support Dr. Colón's opinion.  (R. 67.)  The ALJ consequently gave little weight to Dr. Colón's opinion.

The ALJ also reviewed a March 2011 opinion from psychotherapist Willie Garrett, but decided not to consider this opinion because it was considered in connection with a prior decision by another ALJ.  (R. 67.)[4]

---

[4] Chang's previous application for disability benefits, in which he alleged a disability date of January 1, 2009, was denied on June 30, 2011.  (R. 71-85.)

The ALJ also considered the opinion of Chang's primary care physician, Dr. Councilman, and found Dr. Councilman had not reported any specific work limitations beyond those set out in the ALJ's RFC described above.

Numerous professionals assessed Chang's GAF.  Throughout his treatment, Dr. Colón assessed Chang as having GAF scores of 41-50.  (R. 68.)  Dr. Schuler, the SSA consulting psychologist, assessed his GAF score as forty-two.  (R. 68.)  Another practitioner assessed Chang's GAF score as 41-50 in June 2013.  (R. 68.)  The ALJ gave all of these scores little weight and noted that they were not supported by the record, which showed minimal mental health treatment, Chang's ability to attend school when he had to, and his ability to be the sole caretaker of his children while his wife was on a trip to Thailand.  (R. 68.)  Additionally, the ALJ found the scores to be based on Chang's self-reported symptoms and not on objective findings.  (R. 68.)  The ALJ found it significant that despite such low GAF scores, not one mental health provider suggested more intensive treatment or even a psychological admission.  (R. 68.)

The ALJ also identified inconsistencies in Chang's statements and the objective medical record.  (R. 66.)  For example, Chang told a therapist in June 2013 that his wife was disabled, but the ALJ found that was inconsistent with his reports that she did all the household chores, meal preparation, and child care for their three children under the age of ten.  (R. 66, 403.)  The ALJ also noted that in January 2014 Chang reported to a social worker that he was frustrated taking care of his children while his wife was in Thailand visiting relatives.  (R. 66. 490-92.)  He also reported feeling stressed because a county

worker required him to attend school to receive continued benefits and wanted him to look for work.  (R. 66, 486.)  Chang ultimately attended school for a month before the social worker determined that it would be best if he learned English.  (R. 66, 486.)  The ALJ also commented that Chang stopped attending English-language classes because he moved further away and lacked transportation.  (R. 66, 528.)  The ALJ therefore concluded Chang had greater residual functional capacity than he alleged.  (R. 66.)

The ALJ next found Chang had no past relevant work, he was a younger individual based on SSA regulations, he was not able to communicate in English, meaning that he was considered in the same way as an individual who is illiterate in English, and transferability of job skills was not in issue because of the lack of past relevant work.  (R. 68-69.)

At the fifth and final step, the ALJ relied on the vocational expert's testimony to find that Chang could have worked as a bench assembler, molding machine tender, or cleaner.  (R. 69.)  Thus, she concluded, Chang was not disabled.  (R. 70.)

## II.      Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts

from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  To meet the statutory definition of disability for SSI purposes, the claimant must establish that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also* 42 U.S.C. § 423(d)(1)(A) (providing a nearly identical definition for claimants seeking DIB).  The disability, not just the impairment, must have lasted or be expected to last for at least twelve months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III.   Discussion

Chang argues that the ALJ improperly gave little weight to Dr. Colón's opinion. Chang also argues that the ALJ improperly assessed his RFC by failing to incorporate limitations related to Chang's hallucinations as well as limitations related to his inability to handle stress.  Additionally, Chang argues the ALJ improperly assessed his RFC by

relying on an outdated non-examining source opinion from one of the state agency consultants.

### A.    Whether the ALJ Erred in Giving Little Weight to Dr. Colón's Opinion

Chang argues that the ALJ improperly gave little weight to the opinion of his treating psychiatrist, Dr. Colón.[5]  A treating source's opinion on the nature and severity of a claimed impairment is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ need not give controlling weight to an opinion that is not well-supported by clinical findings or laboratory techniques or is inconsistent with other substantial evidence.  *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).  If the opinion of a treating source is not afforded controlling weight, the ALJ must consider the following factors in deciding what weight is due: (1) the existence of an examining relationship; (2) the nature of the treatment relationship, such as length of treatment and frequency of examination; (3) the degree to which the opinion is supported by medical evidence such as medical signs and laboratory findings; (4) consistency with the record; (5) the source's specialty; (6) any other relevant factors.  20 C.F.R. §§ 404.1527(c), 416.927(c).  "It is the function of the ALJ to weigh conflicting evidence and to resolve

---

[5] While Chang describes the other opinions in the medical record, he challenges only the ALJ's determination about the weight to be given to Dr. Colón's opinion and her use of Dr. Alsdurf's opinion in formulating the RFC.

disagreements among physicians." *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

Moreover, the ALJ need not credit an opinion that is inconsistent with other substantial

evidence. *See Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).

In December 2012 Dr. Colón, Chang's treating psychiatrist, provided a mental

medical source statement. (R. 319-21.) The opinions he reported in that statement are set

forth above at pages 8-9. But the ALJ gave little weight to Dr. Colón's opinion on the

grounds that it was based only on Chang's self-reported symptoms, but not supported by

any observations, mental status examinations, or objective findings. (R. 67.)

Additionally, the ALJ found Dr. Colón's subsequent visits with Chang showed that he

experienced improvement with medication, and that his daily and overall activities did

not support Dr. Colón's opinion. (R. 67.)

Chang argues, among other things, that the ALJ failed to recognize Dr. Colón's

role as Chang's treating specialist. But the ALJ specifically acknowledged that

Dr. Colón was Chang's treating psychiatrist. (R. 67.) She also described the nature of

the treatment relationship, including the length of treatment and frequency of

examination, noting that Dr. Colón saw Chang approximately every three months, and

recounting his treatment notes from 2011-2013. (R. 65-68.)

The ALJ found, however, that Dr. Colón's opinion relied solely on self-reported

symptoms, and that the totality of his notes and findings failed to support his conclusions.

In describing the basis for her finding, the ALJ did not cite specific pages from the

records, but incorporated the discussion of Dr. Colón's treatment notes set forth earlier in

her opinion.  Her findings that Chang experienced an improvement in his mood and

symptoms due to medication use seem to refer to Chang's November 2011, March 2012,

March 2013, April 2013, and May 2013 appointments with Dr. Colón.  (R. 67.)  But an

independent review of those treatment records reveals that the ALJ apparently misread

treatment notes for two of those appointments, and that she failed to recognize the

waxing and waning nature of Chang's mental health.  First, while Chang did report some

improvement in his mood in November 2011, he still complained of low concentration

with anxiety and irritability, and Dr. Colón noted that his mood had not stabilized.  The

treatment notes from March 2012 indicate the same.  Additionally, while the ALJ states

Chang demonstrated improvement in April 2013 appointment, the treatment notes

actually state that Chang experienced a drop in mood.  Indeed, there are at most four

appointments from Chang's nearly fifteen appointments with Dr. Colón from which the

treatment notes indicate improvement, and those appointments were interspersed

throughout his treatment with Dr. Colón, indicating that Chang never experienced

consistent improvement in his mental health symptoms.  The records show Dr. Colón

continuously changed Chang's medications in an effort to treat his mental health

symptoms, but as of 2014, Chang's mood was still down, with low energy, low

motivation, low concentration, and irritability.  (R. 417-18.)  Overall, the record shows

that by the end of the treatment period reflected therein, Chang's mental health had still

not resolved or stabilized.  The Court therefore finds the ALJ erred in finding that

Dr. Colón's opinion was not supported by the records of his treatment of Chang.

The ALJ also found Dr. Colón's opinion was not supported by any objective examination or findings but instead relied solely on Chang's self-reported symptoms. During several of Chang's appointments with Dr. Colón, however, Dr. Colón separately reported findings from a mental examination.  (*See, e.g.*, R. 250 (finding Chang's affect to be euthymic, but his memory was intact); R. 416 (finding Chang's mood to be depressed, his affect euthymic, his memory intact, with good insight); R. 417 (same); R. 418 (same).)  Indeed, the Commissioner appears to recognize that Dr. Colón relied on more than Chang's self-reported symptoms, stating "Objective findings showed intact memory, good insight, normal psychomotor activity and speech, and no tangentiality or loose associations." (Def.'s Mem. at 9 [Doc. No. 17].)  Furthermore, Dr. Colón relied on his own observations as well as Chang's self-reported symptoms to prescribe and continuously adjust Chang's medications.  The Court therefore finds the ALJ erred in finding that Dr. Colón's opinion was solely based on Chang's self-reported symptoms and was not supported by objective findings.

The ALJ also found Dr. Colón's opinion was not supported by Chang's activities of daily living.  It is well-established that an ALJ may consider a variety of factors in assessing the credibility of a claimant's subjective symptoms.  *E.g.*, *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (requiring the ALJ to consider, in addition to the objective medical evidence, a claimant's daily activities; work history; intensity, duration, and frequency of symptoms; side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions).  In support of her argument that

Chang was only mildly restricted in activities of daily living, the ALJ cited records that showed Chang would occasionally walk with his children to the park and sometimes play video games with them. (R. 61.) He was able to drive a car and use public transportation. (R. 61.) He also was able to bathe independently when reminded and able to make noodles and pour cereal. (R. 61.) The ALJ also cited records that showed Chang occasionally accompanied his family on grocery shopping trips. (R. 62.) Records also showed Chang was able to watch television and movies, look at magazines, and read Hmong newspapers. (R. 62.) The ALJ also recounted records that showed Chang cared for his children while his wife went to Thailand to visit relatives and he attended English language classes. (R. 66.) But the records do not describe how well Chang was able to care for his children during that time. And although Chang attended English language classes, the records reflect he attended these classes for years without learning English, so his attendance alone does not support any finding as to his ability to concentrate or learn. Thus, while the ALJ was correct that these activities do not affirmatively support Dr. Colón's opinion that Chang was completely unable to function independently outside of his home, neither are they inconsistent with Dr. Colón's findings that Chang was markedly limited in numerous work-like functions, including his ability to understand and remember very short and simple instructions, and maintain attention and concentration for more than two hour segments.

In sum, the ALJ erred in finding that Dr. Colón's opinion conflicted with his treatment notes as well as that his opinion was not supported by examination and

objective medical findings.  Of most concern, the ALJ misread some of Dr. Colón's

treatment notes and gave the impression that Chang's mental health improved when it

actually waxed and waned, and was poor most of the time.  The ALJ was correct,

however, that some of Chang's activities of daily living appeared to conflict with

Dr. Colón's opinion of total disability, but these activities were not sufficient to warrant

disregarding Dr. Colón's entire opinion.  The Court therefore recommends remanding

this case to the ALJ for reconsideration of Dr. Colón's opinion in light of the analysis

above.

**B.      Whether the ALJ Erred in Her Assessment of Chang's RFC**

If a claimant's impairment does not meet or equal a listed impairment at step

three, the ALJ must assess whether a claimant has the RFC "to do substantial gainful

activity (SGA).  The determination of mental RFC is crucial to the evaluation of [a

claimant's] capacity to do SGA when [the claimant's] impairment(s) does not meet or

equal the criteria of the listings, but is nevertheless severe."  20 C.F.R. pt. 404, subpt. P,

app. 1, § 12.00(A).  The claimant bears the burden to establish his or her RFC.

*Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

A person's RFC is the most he or she can do in a work setting despite his or her

limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ must consider "all of

the relevant medical and other evidence" in making this determination.  20 C.F.R.

§§ 404.1545(a)(3), 416.945(a)(3); *see Eichelberger*, 390 F.3d at 591 ("The ALJ

determines a claimant's RFC based on all relevant evidence, including medical records,

29

observations of treating physicians and others, and the claimant's own descriptions of his

or her limitations.").

### 1.   Whether the ALJ Erred in Failing to Include Limitations Associated with Psychosis or Hallucinations in Chang's RFC

Chang argues that the ALJ erred in determining his RFC because she never

mentioned medical records that diagnosed him with psychosis and described his reported

hallucinations.  Chang argues that medical records show he experienced sightings of

ghosts and conversations that did not occur, although he does not actually cite the

medical records he contends the ALJ should have taken into account.  (Pl.'s Mem. at 21-

24 [Doc. No. 15].)  Regardless, a review of the record shows the ALJ's decision not to

include psychosis as one of his severe impairments and incorporate limitations from

hallucinations into his RFC is supported by substantial evidence.  The only records that

appear to show hallucinations or symptoms of psychosis are those from social worker

Vah, Dr. Schuler, Dr. Councilman (in 2014 and 2015), and Dr. Tupper.  Of these,

Dr. Tupper's opinion and Dr. Councilman's opinion describing psychosis and her

accompanying treatment notes were rendered after the ALJ's decision.  Chang argues this

Court must consider all evidence of record, but the Court need only consider evidence

before the Appeals Council.  The Appeals Council considers only evidence relating to the

relevant time period, and it therefore was within its province not to consider these

records.  *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

The ALJ also acted properly in disregarding Dr. Schuler's treatment notes describing dreams and imagined conversations.  Importantly, Dr. Schuler diagnosed Chang as having major depressive disorder, recurrent, moderate to severe, *without* psychotic features.  (R. 66 (emphasis added).)  Furthermore, Dr. Schuler noted Chang did not describe any frank hallucinations, but rather dreamlike experiences.

The only other records referring to hallucinations are those from social worker Vah, who completed a diagnostic assessment on November 12, 2013, and wrote that the presenting problems were hallucinations, flashbacks, intrusive thoughts, nightmares, and other mental health symptoms.  (R. 491.)  On that visit, Vah diagnosed Chang with major depression with psychotic features, PTSD, and anxiety.  (R. 495.)  She also found he had a personality disorder.  (R. 495.)  Chang saw Vah again on January 9, 2014, and reported hearing voices and sounds as if people were talking to each other.  (R. 489.)  But although Vah again diagnosed Chang with depression, she did not diagnose him with psychosis at that visit, nor at any of his subsequent visits.  (R. 491, 489, 486.)  In fact, Vah's November 12, 2013, assessment was the only occasion during the relevant time period that any of his providers diagnosed him as having psychotic features.  In contrast, Chang denied hallucinations and delusions during every appointment he had with his treating psychiatrist, Dr. Colón. Substantial evidence therefore supports the ALJ's determination not to include limitations deriving from hallucinations or psychosis in Chang's RFC.

## 2. Whether the ALJ Erred in Failing to Include Limitations in Chang's RFC Relating to His Inability to Handle Stress

Chang also argues that the ALJ improperly failed to include limitations in his RFC relating to his inability to handle stress.  The ALJ cited consulting psychologist Dr. Alsdurf's July 16, 2012, opinion, described at pages 9-10 above, in formulating the RFC. Chang argues that the ALJ improperly relied on Dr. Alsdurf's opinion in formulating the RFC.  As non-treating sources, the state agency psychological consultants' opinions are not entitled to controlling weight, *see* 20 C.F.R. § 416.927(c)(2), although they are entitled to be weighed under § 416.927(c).  "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  Social Security Ruling ("SSR") 96-6p (S.S.A. July 2, 1996), 1996 WL 374180, at *2; *see also* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  In fact, an ALJ "must consider and evaluate" a state agency medical consultant's residual functional capacity assessment.  *Id*. at *4. Moreover, in appropriate circumstances, opinions from state agency consultants "may be entitled to greater weight than the opinions of treating or examining sources."  *Id.* at *3.

Chang argues the ALJ improperly relied on Dr. Alsdurf's opinion for two reasons. First, Dr. Alsdurf's opinion conflicted with Dr. Colón's opinion and therefore should have been discounted.  Second, Dr. Alsdurf based his opinion on an incomplete record.

As explained above, the Court finds the ALJ erred in giving limited weight to Dr. Colón's opinion.  Dr. Colón's opinion is the only treating psychiatric opinion of

record, and Dr. Alsdurf's opinion therefore cannot constitute substantial evidence in the

face of a conflicting treating source opinion.  *See Thiele v. Astrue*, 856 F. Supp. 2d 1034,

1047 (D. Minn. 2012) ("The opinion of a nonexamining physician, standing alone, does

not constitute substantial evidence in the record in the face of a conflicting assessment of

a treating physician."  (citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999))).  The

ALJ primarily developed her RFC finding using Dr. Alsdurf's opinion, and the Court

therefore recommends remanding for the ALJ to reconsider Dr. Colón's opinion in light

of the errors identified herein, and if necessary, redevelop the RFC.

The Court next turns to Chang's argument that the ALJ cannot rely on

Dr. Alsdurf's opinion because he did not have the entire record when completing his

opinion.  Dr. Alsdurf completed his opinion on July 26, 2012, and the ALJ held the

administrative hearing on June 10, 2014, nearly two years later.  In particular, Chang

argues that Dr. Alsdurf did not have access to medical evidence of his new diagnosis of

depression with psychosis.

Other courts have held it was appropriate for an ALJ to consider a consultant's

opinion where a similar interval had elapsed between the opinion and the hearing where

the ALJ reviewed subsequent medical evidence and found it consistent with the

consultant's findings.  *See Kohn v. Colvin*, No. C13-4003-MWB, 2013 WL 5375415, at

*13 (N.D. Iowa Sept. 26, 2013), *R. & R. adopted*, No. C 13-4003-MWB, 2013 WL

6858433 (N.D. Iowa Dec. 30, 2013) (eighteen-month difference) (citing *Chandler v.

Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[B]ecause state agency review

precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision.  The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it."). Additionally, that "a state agency medical consultant did not have access to all of the records does not prevent the ALJ from assigning significant weight to the consultant's assessment if the ALJ conducted an independent review of the evidence, which included notes the consultant had not considered."  *Perry v. Colvin*, No. 13-cv-1185 (JNE/TNL), 2014 WL 4113015, at *57-58 (D. Minn. Aug. 20, 2014) (quoting *Vue v. Colvin*, No. 13-cv-357 (ADM/FLN), 2014 WL 754873, at *9 (D. Minn. Feb. 26, 2014)).

Here, the ALJ did not err by choosing to rely on a consultant's opinion issued approximately two years before her final decision.  Additionally, although Dr. Alsdurf did not have access to the medical records from 2013 describing Chang's hallucinations and symptoms of psychosis, the ALJ conducted an independent review of the evidence. While she did not mention Chang's report of hallucinations explicitly, she cited the November 13, 2013, record from Chang's social worker Vah in which he reported symptoms of PTSD.  (R. 66.)  That record also includes Chang's report to Vah of hallucinations.  (R. 491.)  And, she cited a January 2014 record from Vah in which Chang expressed stresses over various aspects of his life.  (R. 66.)  Chang also described hallucinations during that visit.  (R. 489.)  Further, as described above, the decision not to include limitations in Chang's RFC based on hallucinations or psychosis was supported by substantial evidence in the record.

34

However, although the Court finds it was not error per se for the ALJ to consider

Dr. Alsdurf's opinion simply because of its age, the ALJ's renewed consideration of

Dr. Colón's opinion may also prompt her to consider whether Dr. Alsdurf's opinion fails

adequately to account for the subsequent waxing and waning of Chang's mental health.

Chang also argues the ALJ should have considered facts showing that his life

centered around his domicile.  It is not clear whether he proffers this argument in support

of his position that the RFC should have included limitations related to psychosis or

limitations related to stress.  Either way, Chang has not described what additional

limitations would or should result from facts showing that his life centered around his

domicile.  The ALJ recognized that his life was routine and structured and therefore

limited his RFC to performing routine, repetitive three-to-four step tasks and instructions

where the routine during the day was fixed and predictable, with minimal, if any, day-to-

day changes.  (R. 63.) The Court finds no error in the ALJ's RFC with regard to

consideration of the extent to which Chang's life was centered around his domicile.

### 3.   Whether Mental Functional Limitations Were Properly Incorporated in the RFC

Chang argues the ALJ should have included additional mental functional

limitations in his RFC.  In particular, Chang contends the RFC should have reflected his

difficulty in responding appropriately to criticism from supervisors, his difficulty

interacting with coworkers, customers, and the general public, his limitations in

responding to ordinary work pressures, and his difficulties with concentration,

persistence, and pace.  Chang explains that because Dr. Alsdurf checked boxes on

Section I of the Mental RFC Form that he was moderately limited in his ability to:

(1) complete a normal work week and perform at a consistent pace without an

unreasonable number and length of rest periods and (2) accept instructions and respond

appropriately to criticism from supervisors, the RFC should have included additional

mental limitations.

Section I of the Mental RFC Form, which included the checkboxes, "*does not

constitute the RFC assessment*."  *See* POMS DI 24510.060(B)(2), 2001 WL 1933367

(emphasis in original).  Additionally, the narrative explanation in Section III "explain[s]

the conclusions indicated in section I, in terms of the extent to which these mental

capacities or function could or could not be performed in work settings."  *Id.* at (4)(a).

The Court does not find the boxes Dr. Alsdurf checked and then subsequently

explained in narrative form regarding performance in work settings to be contradictory.

Dr. Alsdurf marked boxes that Chang would be limited in his ability to perform at a

consistent pace without breaks as well as being limited to accept instructions and respond

appropriately to criticisms from supervisors.  In the narrative portion of his opinion,

Dr. Alsdurf translated these limitations by limiting Chang to routine, repetitive tasks, and

three and four step, uncomplicated instructions.  (R. 273.)  While the ALJ did not

specifically remark on Chang's ability to accept criticism from supervisors in a work

setting, she limited Chang to the routine stressors of a routine, repetitive, and three and

36

four step work setting.  (R. 273.)  The Court therefore finds the ALJ did not err by failing

to include additional limitations from Dr. Alsdurf's opinion in the RFC.

Nevertheless, as stated above, it is possible that the ALJ will need to reformulate

the RFC because the ALJ erred in considering treating psychiatrist Dr. Colón's opinion.

Proper consideration of Dr. Colón's opinion may also require inclusion of additional

limitations on his mental function in the resulting RFC.

Based on all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1. Plaintiff Dang Chang's Motion for Summary Judgment [Doc. No. 14] be

   **GRANTED IN PART AND DENIED IN PART**; and

2. Defendant Carolyn W. Colvin's Motion for Summary Judgment [Doc. No. 16]

   be **GRANTED IN PART AND DENIED IN PART**; and

3. The decision of the Commissioner be **REVERSED**; and

4. This matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g),

   for further proceedings consistent with this Order, including:

   a. The ALJ shall reconsider Dr. Colón's opinion in light of the discussion

      above and in accordance with 20 C.F.R. § 416.927(c).

   b. Depending on the new weight assigned to Dr. Colón's opinion, the ALJ

      shall redevelop the RFC if necessary.

Dated: February 6, 2017                _s/ Hildy Bowbeer_____
                                       HILDY BOWBEER
                                       United States Magistrate Judge

37

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.